**CENTURY REFINING COMPANY,**
Appellant,
v.
**Charles T. HALL, Appellee.**

**Charles T. HALL, Cross-Appellant,**
v.
**CENTURY REFINING COMPANY,**
Cross-Appellee.
Nos. 7080, 7081.

United States Court of Appeals
Tenth Circuit.
March 14, 1963.

Robert H. Harry, Denver, Colo. (George E. Lohr and William S. Huff, Denver, Colo., were with him on brief), for Century Refining Co.

Richard B. Foley, Galligan & Foley, Denver, Colo., for Charles T. Hall.

Before MURRAH, Chief Judge, and PICKETT and LEWIS, Circuit Judges.

MURRAH, Chief Judge.

This appeal by Century Refining Company and cross-appeal by Charles T. Hall is from a judgment in an action by Hall against Century to recover money claimed to be due him under two contracts, and for damages in consequence of Century's alleged wrongful termination of one of them.

Hall was a wholesaler and distributor of petroleum products in the Denver, Colorado area. Century operated a refinery approximately 300 miles away near Garden City, Kansas. Early in 1958, Century entered into a sales contract with Hall whereby Hall was to purchase Century gasoline for distribution through his own retail outlets and to his wholesale customers in the Denver area.

The sales contract provided in presently material part that "if your gasoline purchases amount to six million (6,000,-000) gallons or more during the twelve-month period from January 1, 1958 to January 1, 1959, you will receive one-fourth (¼) cents per gallon refund."

It was further provided that "This contract shall continue for one year from the date hereof and thereafter shall renew and extend itself from year to year unless terminated by notice in writing of either party * * *."

During the year 1958, all of Hall's purchases were delivered to his storage facilities and redelivered to his own retail outlets and to his wholesale customers. His purchases for the year 1958 were not sufficient to entitle him to the ¼ cent per gallon refund provided in the contract. Neither party having notified the other of termination, the contract was automatically renewed for the year 1959. Early in 1959, and while the sales contract was in force, the parties orally agreed that Century would give Hall a stipulated per gallon credit on all products sold by Century to certain specified dealers in the Denver area, and the agreement was later confirmed in writing.[1] Hall's direct purchases of gasoline from Century during 1959 were not sufficient to entitle him to the ¼ cent per gallon refund provided in the original contract, but when added to the direct sales by Century to specified dealers, the aggregate exceeded the requisite amount. Nothing was said in the oral agreement as confirmed as to whether these direct sales by Century could be added to Hall's purchases in computing the requisite amount. Century formally terminated all of its contractual relations with Hall in November 1959. This suit followed. It was commenced in the Colorado state courts and removed to the federal court on requisite diversity.

The complaint is stated in three claims: (1) under the original contract for the ¼ cent refund based on the aggregated purchases by Hall and direct sales made by Century to the speci-

[1]. "Mr. C. T. Hall, 5901 N. Federal, Denver, Colorado
"Dear Mr. Hall: This is to confirm that this company will give you a credit of $.001 per gallon on all products sold by us to the following accounts:
"Cascade Oil Company
"Eclipse Petroleum Company
"Gleason Oil Company
"Pyramid Petroleum Company
"This is to confirm that this company will give you a credit of $.005 per gallon on all products sold by us to Western Oil Supply.
"Very truly yours,
"Maurice L. Brown
"Vice-President"

fied dealers during the year 1959—agreed to be in excess of the requisite 6,000,000 gallons; (2) under the subsequent agreement for the specified per gallon credit on sales made by Century to the designated dealers, i. e., see Footnote 1; and (3) damages for the alleged wrongful termination by Century of the subsequent agreement.

Trial by jury on the first two claims resulted in a verdict for Hall, and judgment was entered thereon. The judgment on the second claim has been satisfied and is not involved in this appeal. The trial court directed a verdict and entered judgment for Century on the third claim and that judgment is the subject of Hall's cross-appeal.

As to the first claim, the trial court ruled as a matter of law that the original sales contract was automatically extended in its entirety for the year 1959, and that there was no dispute between the parties as to any transaction for the year 1958. It submitted to the jury the question whether during 1959 Hall purchased 6,000,000 gallons of gasoline or more within the meaning of the ¼ cent per gallon refund provision of the original contract. After clearly and succinctly stating the respective contentions of the parties with respect to this issue, the court then told the jury that as to the first claim, there was just one question of fact for it to determine, that is, whether " * * * it was the intention of the parties that in computing the 6,000,000 gallons of gasoline there should be included or excluded the gasoline delivered * * * " by Century to the specified dealers under the subsequent contract.

Century did not specifically object to this instruction, but moved for a directed verdict and for a judgment n. o. v. based on its contention throughout the trial of the case to the effect that Hall's rights under the first claim are limited to the four corners of the unambiguous original contract, according to which Hall's purchases admittedly did not amount to 6,000,000 gallons of gasoline; that the subsequent oral agreement, as confirmed, providing for the specified credits for sales to specified dealers, bore no relationship whatsoever to the original contract, and particularly to the provision with respect to the ¼ cent per gallon refund. The supportive argument is twofold. (1) Although the basic provisions of the original contract were automatically extended through the year 1959, the provisions with respect to the ¼ cent per gallon refund is strictly applicable to "your gasoline purchases * * * during the twelve (12) month period from January 1, 1958 to January 1, 1959 * * *." And, that the renewal did not operate to extend that provision beyond the period provided therein. (2) If the contract was renewed in its entirety, the words "your purchases" limits its coverage to Hall's direct purchases during 1959, and has no application to Century's direct sales to the specified dealers made under the subsequent contract.

The trial court ruled as a matter of law that "the extension of the sales contract included all of the terms of the contract, including its typewritten portion." We think the trial court was eminently correct. It is of course "well settled that where printed and written or typed provisions of a contract are in conflict and cannot be harmonized, the latter prevails over the former as being the language deliberately selected by the parties to express their considered intent." Broderick Wood Products Co. v. United States, 10 Cir., 195 F.2d 433. But, it also is a cardinal rule of construction that "written instruments must be so construed, if possible, as to give effect to all of the provisions thereof." Moyer v. Walker, 10 Cir., 276 F.2d 681. We think it would be wholly inadmissible to say that the parties intended to automatically renew only a part of the contract.

It is true, as Century suggests, that nothing was ever said either orally or in writing concerning the applicability of the refund provision in the original contract to direct sales to the specified dealers under the subsequent agreement.

Indeed, the trial court took note of the conspicuous silence in that regard, and it was on that basis that it determined to submit to the jury the question of the intent of the parties in respect thereto in the light of all the surrounding circumstances, including the conduct of the parties.

It is pertinent to note, as did the trial court, that when the original contract was made, Hall was an established retail and wholesale dealer of petroleum products in the Denver area. He maintained a bulk station from whence he sold and delivered gasoline wholesale to retail outlets in the Denver area, including some, if not all, of the dealers specified in the Century contract. Century operated a refinery some 300 miles from Denver. It had never done any business in the Denver area, and its only business contact at the time was with Hall.

Hall was permitted to testify without objection that in the performance of the original contract during the year 1958, all of his purchases from Century were first delivered to his bulk station and redelivered to his own retail outlets and to his wholesale customers; that in order to avoid double handling and duplicate billing for the customer sales, it was orally agreed early in 1959 that these sales would be delivered and billed directly by Century to specified dealers; and the profit he had realized from his sales to these dealers in 1958 would be recognized by a stipulated per gallon credit. He testified that he called on these specified dealers, solicited their business, and arranged for the direct sales.

The Vice-President and General Manager of Century who confirmed the oral agreement was permitted to testify without objection that when the original contract was made, Century was unfamiliar with the Denver trade territory, and that they depended upon Hall to find a market for their products in that area; that they knew a part of Hall's purchases would go to his own retail outlets and a part to the other dealers; that Century was not interested in whether he purchased the gasoline, or whether he obtained people to purchase it, and that after the oral agreement was made early in 1959, Hall called on the specified dealers, as well as others, and kept Century informed concerning prospective purchasers and the estimated amount of their purchases.

Century insists that all of this testimony was admitted as relevant to the second and third claims under the subsequent agreement, and that it was not admitted to prove any issue under the first claim, which they contend is confined within the bounds of the original agreement. They take the position that the factual issue submitted to the jury was not disclosed by the pleadings or the pre-trial order, and did not become an issue in the trial of the case until it was submitted to the jury by the court's instructions, and that it therefore came too late and is prejudicial.

We have had occasion to emphasize the proper place and functions of the pre-trial conference and ensuing order in the adjudicatory process. We have recently said " * * * The pre-trial conference, after utilization of discovery, is the proper time and place for settling the triable issues in the case. It is the appropriate time and place for the parties to state the grounds upon which they expect to prevail in the lawsuit. And, once triable issues are thus agreed upon, they ought not be altered or modified except to prevent manifest injustice." Taylor v. Reo Motors, 10 Cir., 275 F.2d 699.[2] Making application of this concept, we have held that the injection of a new issue or theory into the trial of the case in the form of an instruction comes too late and is properly excluded. See Miller v. Brazel, 10 Cir., 300 F.2d 283. But, while the pre-trial

---

2. And see "When is a Pre-trial Conference a Pre-trial Conference?" by Judge A. Sherman Christenson, 23 F.R.D. 129; "The Pre-trial Order" also by Judge Christenson, 29 F.R.D. 362; "Pre-trial Conference—a Study of Methods" by Judge William F. Smith, 29 F.R.D. 191, 348.

order should measure the dimensions of a lawsuit and govern its course in the absence of some good reason for departure, this does not mean that the order should not be liberally construed to embrace all of the legal and factual theories inherent in the issues defined therein. Any other construction of the pre-trial order would tend to unduly constrict the trial of the case and defeat the central and salutary purpose of the Federal Rules of Civil Procedure to insure the trial of every lawsuit on its merits.[3] It is a procedural tool to facilitate the trial of a lawsuit on its merits and not to defeat it on a technicality. We must not allow ourselves to construe the pre-trial order in the spirit of a common law pleading.

The amended complaint alleged in material part that "in reliance upon the promises of the defendant, the plaintiff spent a great deal of time, effort and money to obtain sufficient outlets for the defendant's gasoline, in order that he could exceed the 6,000,000 gallon figure set forth in said Exhibit A." The pre-trial order recited the respective contentions of the parties and specifically recited, "the plaintiff claims that the defendant owes the plaintiff the sum of $20,000.00 for refunds or credits which defendant allegedly promised to pay the plaintiff for gasoline purchases made from the defendant, either directly by or through the plaintiff's efforts during the calendar year 1959." Under the heading of contested issues of fact and law relating to the first claim, the pre-trial order recited both the plaintiff's and defendant's version of the issue, and while they are couched in different language, the

substance is unmistakably the same.[4] In Century's language, it is whether "in computing the 6,000,000 gallons required to be purchased by the plaintiff for the purpose of obtaining a $\frac{1}{4}$ cent refund under the terms of plaintiff's Exhibit 1, may the plaintiff add to his own purchases, the purchases from the defendant * * *" made to the specified dealers.

As we have seen, Century would construe this as strictly confining Hall to the terms of the first contract and would construe the provision with respect to the $\frac{1}{4}$ cent per gallon refund as strictly applicable to "your gasoline purchases * * * during the twelve (12) month period from January 1, 1958 to January 1, 1959 * * *." But we think the pre-trial order, properly construed, squarely presents the issue which the trial court submitted to the jury.

This brings us to the ultimate question whether the testimony concerning the making and performance of the latter contract was admissible to alter, modify, explain or interpret the first contract. The original contract was truly unambiguous—no one contends otherwise. It is also true that Hall's right to recover on his first claim must stand or fall on that contract. But we do not think he is confined to its four corners in his proof in support thereof. The contract provides that any modification must be in writing, but under applicable Kansas law, the requirement may be "waived, modified or rescinded by a subsequent oral contract. While an intent to waive, modify or rescind must be shown, that may be inferred from the actions of the parties." J. T. Majors

3. And see "To an Understanding Use of Pre-trial," 29 F.R.D. 454; and "Simplified Pleading," 2 F.R.D. 456, by Judge Charles E. Clark.

4. "(b) May the plaintiff include gasoline purchased directly and through plaintiff's customers in computing the 6,000,000 gallons of gasoline required to be purchased by the plaintiff for the purpose of obtaining the $\frac{1}{4}$ cent refund under the terms of plaintiff's Exhibit 1? (Plaintiffs' version)

"(c) In computing the 6,000,000 gallons of gasoline required to be purchased by the plaintiff for the purpose of obtaining a $\frac{1}{4}$ cent refund under the terms of plaintiff's Exhibit 1, may the plaintiff add to his own purchases the purchases from the defendant made by Cascade Oil Company, Eclipse Petroleum Company, Gleason Oil Company, Pyramid Petroleum Company and Western Oil Supply Company? (Defendant's version)"

& Sons, Inc. v. Lippert Bros., Inc., 10 Cir., 263 F.2d 650; see also Beard v. Achenbach Memorial Hospital Ass'n, 10 Cir., 170 F.2d 859.

It is also well settled in Kansas that " * * * where two or more instruments are executed by the same parties contemporaneously or at different times in the course of the same transaction, and concern the same subject matter, they will be read and construed together so far as determining the respective interests of the parties, although they do not in terms refer to each other." Shepard v. John Hancock Mutual Life Ins. Co., 189 Kan. 125, 368 P.2d 19. Though the latter contract did not refer to the former, and though each contained the necessary elements of a separate and independent contract, they cannot be fairly said to be wholly collateral. The latter contract was made while the former was in full force and was being performed, and they pertain to the same subject matter insofar as they relate to the sale of Century gasoline by Hall or through his efforts in the Denver area. We think it appropriate to look at the latter for the full meaning of the former. And, finding it silent, it is permissible to resort to the surrounding circumstances evidenced by the conduct of the parties to determine their intention with respect to the meaning of their contract and the manner of its performance. Cf. Mathis v. Public School Dist. No. 103, 175 Kan. 453, 264 P.2d 1082; Thos. J. Dyer v. Bishop Intern. Engineering Co., 6 Cir., 303 F.2d 655. Certainly we do not reason in a vacuum. We judge the parties as we find them according to what they have said and what they have done to determine the bargain they have made.

When the trial judge came to rule on the motion for directed verdict on the first claim, he observed that if Hall had continued to serve his wholesale customers in 1959 as he did in 1958, "certainly their purchases would have counted on the 6,000,000 gallons." And, he then proceeded to state the question "as to whether by the new arrangement it was contemplated by the parties that the sole compensation in connection with the purchases direct was to be that stated in the agreement or whether the gallonage was to be used in computing the 6 million gallons." He then concluded by saying that the evidence in that regard presented a factual issue for the jury. In his ruling on the motion for judgment n. o. v., he observed that "not one word was said as to whether these [direct deliveries] * * * were or were not to be included in the computation of the six million gallons. However, there being an absence of anything expressed in writing, again we go back to the background of the purposes of the parties." In language that was clean, clear and sharp, the court submitted this issue to the jury, and we think appropriately so.

The judgment on the first claim is affirmed.

## CROSS APPEAL

In his cross appeal from the judgment on the directed verdict on the third claim for unlawful termination of the last agreement, Hall treats the agreement as for a conventional product agency or distributorship. Generally, an agency contract of this kind which fixes no date or time for its duration may be terminated at any time at the election of either party, unless one of the parties acquires a vested interest in the continuation of the contract by the expenditure of money or other valuable consideration with the consent and approval or acquiescence of the other party; in which event, the law may imply an intention to continue the contract for a reasonable time to permit the party to recoup his investment. Sterling Colorado Agency, Inc. v. Sterling Ins. Co., 10 Cir., 266 F.2d 472; Allied Equipment Co. v. Weber Engineered Products, 4 Cir., 237 F.2d 879; Jack's Cookie Co. v. Brooks, 4 Cir., 227 F.2d 935; Lubrecht v. Laurel Stripping Co., 387 Pa. 393, 127 A.2d 687; Williston on Contracts, Rev. Ed., Vol. IV, § 1027 A; Restatement of the Law of Agency, § 442.

**22**

In support of the judgment on the first claim, Hall took the position that the second agreement merely provided for a change in the method of carrying out the terms of the first agreement. This appeals to us as the most logical and reasonable interpretation of the agreement of the parties. And, the second agreement being silent with respect to duration, the time provided in the first agreement would control and the two contracts would therefore be coexistent and coterminous. Hall's rights thereunder would be governed accordingly. Century having given notice of termination as provided in the contract, the rights and liabilities of the parties came to an end with termination. This being so, Hall's rights under the contract as modified were fully vindicated by the judgments on the first and second claims.

But Century contends that the two agreements were separate and distinct and sought to separately terminate them. Hall seems to agree for the purposes of this claim. While the trial court spoke of the second agreement as a "modification" of the first, it also apparently treated the second agreement as providing for its own duration; and since it provided no definite period, found that it was terminable at will unless the agent made "substantial expeditures * * * over and beyond what would ordinarily be expected of the agency." Finding none, the court proceeded to direct a verdict.

Hall insists that the specified dealers in the second agreement were his "customers" which he had acquired by the expenditure of time and money, and which he turned over to Century for direct service to facilitate the effectuation of the agreement between the parties, and that by the termination of the agreement, Century wrongfully appropriated the "customers" to his detriment.

Hall did undoubtedly expend time and money in the promotion of the sales of gasoline by Century to these specified dealers and thus created a business relationship of some worth, but the record is plain to the effect that the sales Hall made to these dealers in 1958 were upon a transaction-to-transaction basis. There was nothing in these transactions to imply an agreement to purchase any quantity of gasoline at any time. There was no obligation to buy or sell. The same is true with respect to the direct sales by Century under the second agreement. None of the dealers were obligated to buy any quantity of gasoline during any time. The arrangement was on a purely ad hoc basis. The funds expended by Hall are not shown to be for any other purpose. We agree with the trial court that the expenditures were not shown to be over and beyond what would ordinarily be expected of an arrangement of this kind.

The judgment on the cross appeal is affirmed.