**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SANTIAGO IBARRA RIVERA, individually and as class representative, *Plaintiff-Appellant*, <br><br> v. <br><br> COUNTY OF LOS ANGELES; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; COUNTY OF SAN BERNARDINO; SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT, *Defendants-Appellees*. | No. 11-57037 <br><br> D.C. No. 2:10-cv-01861-PSG-DTB <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted
May 8, 2013—Pasadena, California

Filed March 12, 2014

Before: Diarmuid F. O'Scannlain, Richard A. Paez,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by Judge Paez

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's summary judgment in an action in which plaintiff, Santiago Rivera, alleged multiple constitutional and state law violations arising out of his mistaken arrest and month-long detention based on a 1989 warrant which had been issued for another person, also named Santiago Rivera.

The panel rejected Rivera's claim that Los Angeles County violated the Fourth Amendment by issuing the 1989 warrant without including a number corresponding to the true subject's fingerprints. The panel held that the warrant satisfied the particularity requirement because it contained both the subject's name and a detailed physical description. The panel held that even if the Fourth Amendment did require Los Angeles County to include more detailed information in the 1989 warrant, Rivera failed to show that the County had a policy or custom of failing to do so.

The panel held that San Bernardino sheriff's deputies were not unreasonable in believing that Rivera was the subject of the warrant at the time of arrest given that the name and date of birth on the warrant matched Rivera's and the height and weight descriptors associated with the warrant were within one inch and ten pounds of Rivera's true size.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that Rivera's detention did not violate the Due Process Clause of the Fourteenth Amendment.  The panel determined that Rivera had not presented any evidence that either Los Angeles County or San Bernardino County knew that Rivera was not the true subject of the warrant.  Nor did the circumstances of this case suggest that further investigation into Rivera's identity was required, especially given that he had been provided procedural protections and court access.

Finally, the panel affirmed the district court's dismissal of Rivera's state law claims on the basis of state law statutory immunities.

Concurring in part and dissenting in part, Judge Paez stated that although he agreed with the majority that Rivera's Fourth Amendment claims against Los Angeles County and San Bernardino County, his Fourteenth Amendment claims against San Bernardino County, and his state law claims against both counties must fail, he disagreed with the majority's analysis of the due process claim in this case.  In Judge Paez's view, Rivera raised a genuine issue of material fact as to whether Los Angeles County deprived him of liberty without due process of law by failing to investigate his claims of innocence.

**COUNSEL**

Donald W. Cook, Los Angeles, California, argued the cause and filed the briefs for the plaintiff-appellant. With him on the briefs was Robert Mann, Los Angeles, California.

Scott E. Caron, Lawrence Beach Allen & Choi, P.C., Glendale, California, argued the cause and filed the brief for the County of Los Angeles and the Los Angeles County Sheriff's Department. With him on the brief was Michael D. Allen, Lawrence Beach Allen & Choi, P.C., Glendale, California.

James H. Thebeau, Deputy County Counsel, San Bernardino, California, argued the cause and filed the brief for the County of San Bernardino and the San Bernardino County Sheriff's Department.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must deal with a case of mistaken identity arising out of the arrest and detention of a person named on a warrant not intended to describe him.

I

A

In July 1985, a Los Angeles Superior Court issued an arrest warrant for "Santiago Rivera." On June 18, 1989, officers of the Montclair Police Department arrested Santiago

Rivera, the plaintiff in this case, on the 1985 warrant. Fingerprint analysis revealed, however, that the Santiago Rivera who was arrested ("Rivera" or "the plaintiff") was not the Santiago Rivera sought by the warrant ("the subject of the warrant"). Due to the risk of such mistaken identification recurring, the municipal court issued Rivera a judicial clearance form, which indicated that he was not the subject of the warrant.

On July 6, 1989, the court reissued the warrant but did not indicate that Rivera had been determined not to be its subject. The 1989 warrant described the subject as a Hispanic male with brown hair and brown eyes, 5'5" tall, and 180 pounds in weight. It included a date of birth matching Rivera's and suggested that the subject did not have visible scars or tattoos.

On March 7, 2009, deputies from the San Bernadino Sheriff's Department stopped a car in which Rivera was traveling because it lacked a license plate. Using Rivera's identification to run a routine warrant check, the deputies learned of the 1989 warrant for a "Santiago Rivera" with the same date of birth as the plaintiff. Rivera informed one of the deputies that he was not the warrant's subject and had been issued a judicial clearance form after the erroneous 1989 arrest. When asked to produce that form, however, Rivera stated that he could not locate it.

Upon the deputies' request, dispatch informed them that the warrant was active and provided the physical description from the warrant. Rivera's driver's license described him as 5'6" tall and as weighing 170 pounds. Believing Rivera to be the subject of the warrant, the deputies arrested him and took him to a detention center in San Bernadino, where his fingerprints were taken. San Bernadino officials transferred

custody of the plaintiff to the Los Angeles Sheriff's Department two days later.

On the next morning, Rivera appeared in a Los Angeles Superior Court. Represented by a public defender, he did not tell the judge that he was not the subject of the warrant. At his next hearing, on March 24, 2009, Rivera argued that he was not the subject of the warrant. Because the court could not determine whether he was the subject of the warrant at that time, the court remanded Rivera to custody until April 7, 2009. As of April 7, 2009, the staff at the Los Angeles archives had still been unable to locate the documents that would contain the true subject's fingerprints. The court again remanded Rivera to custody while the search for the proper documents continued. Two days later, the court released the plaintiff after it was determined that his fingerprints did not match the fingerprints of the true subject of the warrant.

To prevent mistaken identity in the future, the court issued the plaintiff a new judicial clearance form and added the plaintiff's photograph and fingerprints to the case file. The court also reissued the warrant with the true subject's middle name, which differs from Rivera's middle name.

B

In 2010, Rivera sued Los Angeles County, the Los Angeles County Sheriff's Department, San Bernadino County, and the San Bernadino County Sheriff's Department ("the Counties"), alleging violations of the Fourth and Fourteenth Amendments, violation of the Bane Act (California Civil Code § 52.1), and common law false imprisonment.

The district court granted the Counties' motions for summary judgment on all of Rivera's claims. The district court also denied his motion for reconsideration. Rivera timely appealed.

II

Rivera asserts that the district court erred in rejecting his claims that the Counties violated his Fourth and Fourteenth Amendment rights and that he can recover under 42 U.S.C. § 1983. His complaint alleged multiple constitutional violations, all of which the district court rejected: (1) failure to include biometric identifiers in the 1989 warrant, (2) unlawful arrest based on the 1989 warrant, and (3) illegal detainment after arrest.

A

Rivera first argues that Los Angeles County violated the Fourth Amendment by issuing the 1989 warrant without including a number corresponding to the true subject's fingerprints.[1] The Fourth Amendment requires that any warrant "particularly describe . . . the persons or things to be seized." U.S. Const. amend IV. Rivera's argument amounts to a claim that the particularity requirement of the Fourth Amendment forbade Los Angeles County from issuing the warrant without fingerprint information.

---

[1] Rivera describes his claim as challenging the issuance of the warrant rather than the sufficiency of the warrant to permit arrest. We assume, *arguendo*, that Rivera may state a claim under § 1983 against Los Angeles County for the issuance of an insufficiently particular warrant even though the warrant was issued by a judge.

1

In *United States v. Espinosa*, 827 F.2d 604 (9th Cir. 1987), we evaluated a warrant under the particularity requirement.  The subject of that warrant was described as "a male Latin, name unknown, referred to in affidavit as John Doe # 1 . . . approximately 35 years of age, 5'8"/5'10", approximately 200 pounds with black hair and black full beard."  *Id.* at 607.  Despite the omission of the subject's name, we held that such description sufficed under the Fourth Amendment.  *Id.* at 611.  A warrant containing the subject's sex, race, hair color, as well as approximate height, weight, and age, satisfied the particularity requirement when it was accompanied by an affidavit listing places that the subject might be found.  *See id.*  It follows that a warrant containing the subject's *name*, sex, race, hair color, *eye color*, and *date of birth* (rather than approximate age), in addition to approximate height and weight, is sufficiently particular, even if it does not list places that the subject might be found.

Confirming such analysis, other circuits have held that the inclusion of the subject's name alone satisfies the particularity requirement.  Rejecting the contention that the Fourth Amendment "impose[s] stringent requirements on how warrants must describe their intended subjects," the Seventh Circuit has expressly noted that "an arrest warrant that correctly names the person to be arrested is [generally] considered constitutionally sufficient and need not contain any additional identifying information."  *White v. Olig*, 56 F.3d 817, 819 (7th Cir. 1995); *see also Powe v. City of Chicago*, 664 F.2d 639, 645 (7th Cir. 1981).  The Fifth Circuit has also recognized the general rule that "the inclusion of the name of the person to be arrested on the arrest warrant constitutes a sufficient description to satisfy the

fourth amendment requirement that the person to be seized be described with particularity." *Wanger v. Bonner*, 621 F.2d 675, 682 (5th Cir. 1980).

Thus, the 1989 warrant satisfied the particularity requirement because it contained both the subject's name and a detailed physical description. That the plaintiff was erroneously arrested based on the warrant simply does not affect whether the warrant itself satisfied the particularity requirement.

2

Moreover, municipalities, including counties and their sheriff's departments, can only be liable under § 1983 if an unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). A municipal defendant is liable only "where the entity's policies evince a 'deliberate indifference' to the constitutional right and are the 'moving force behind the constitutional violation.'" *Edgerly v. City and Cnty. of San Francisco*, 599 F.3d 946, 960 (9th Cir. 2010).

Even if the Fourth Amendment did require Los Angeles County to include more detailed information in the 1989 warrant in order to avoid the risk of repeated misidentification, Rivera would have to show that Los Angeles County had a policy or custom of failing to do so. This Rivera has not done. In fact, Los Angeles County had a policy of including an "exoneration" entry that identifies anyone mistakenly arrested on the warrant in the past. That officials apparently failed to implement that policy properly

in this one instance is not sufficient for Los Angeles County to be liable. A single instance is not sufficient to show that a "practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

B

Rivera also argues that San Bernadino sheriff's deputies violated the Fourth Amendment when they arrested him. The deputies had probable cause to arrest the true subject of the warrant but mistakenly believed that Rivera was that person. In such cases, the question is whether the arresting officers had a good faith, reasonable belief that the arrestee was the subject of the warrant. *See Hill v. California*, 401 U.S. 797, 804 (1971) ("[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time.").

On the undisputed factual record, the deputies were not unreasonable in believing that Rivera was the subject of the warrant at the time of arrest. The name and date of birth on the warrant matched Rivera's exactly. The height and weight descriptors associated with the warrant, although not matching Rivera exactly, were within one inch and ten pounds of Rivera's true size. *See id.* at 803–04 & n.6 (ruling that the officers reasonably concluded that the arrestee was the subject of the warrant despite a difference of two inches and ten pounds).

Rivera's statement that he had been issued a judicial clearance form but could not locate it did not make the

officers' belief unreasonable. As the Supreme Court has expressly recognized, police are right to be wary when suspects claim mistaken identity. *See id.* at 803 ("That person claimed he was Miller, not Hill. But aliases and false identifications are not uncommon.").

The deputies' belief that Rivera was the true subject of the warrant was not unreasonable under the Fourth Amendment.

C

Rivera also challenges his detainment after arrest under both the Fourth Amendment and the Fourteenth Amendment. Precedent demonstrates, however, that post-arrest incarceration is analyzed under the Fourteenth Amendment alone. *See Baker v. McCollan*, 443 U.S. 137, 145 (1979) (assuming *arguendo* the ability to state a due process claim for incarceration "pursuant to a valid warrant in the face of repeated protests of innocence"); *Lee v. City of Los Angeles*, 250 F.3d 668, 683–85 (9th Cir. 2001) (separately analyzing the initial arrest under the Fourth Amendment and the post-arrest incarceration under the Fourteenth Amendment).

1

In arguing that his incarceration violated the Fourteenth Amendment, Rivera relies chiefly on our decision in *Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002). In *Fairley*, the plaintiff, John, had been detained for twelve days "without any procedural safeguard in place to verify the warrant he was detained on was his and in the face of his repeated protests of innocence." *Id.* at 918. The *Fairley* court emphasized that John had been detained on a warrant, the subject of which was named "Joe" and differed from John in

weight by 66 pounds, despite the defendants' awareness that John had a twin brother. *Id.* at 915. John was never brought before a judge to assert his claim of mistaken identity. On such facts, we held "there was sufficient evidence for a reasonable jury to find that John suffered a constitutional deprivation under the Fourteenth Amendment." *Id.* at 917.

Rivera's reliance on *Fairley* is misplaced. Cases, like *Fairley*, holding that an incarceration based on mistaken identity violated the Due Process Clause are readily distinguishable from this case. They involved circumstances that might alert the defendants to a mistake of identity, withholding of a judicial forum for raising a claim of mistaken identity, or both.

2

The Supreme Court has suggested that incarceration based on mistaken identity might violate the Due Process Clause in some circumstances. In *Baker v. McCollan*, 443 U.S. 137, 140–41 (1979), a warrant was issued for "Linnie McCollan" because the true subject of the warrant, Leonard McCollan, used false identification. Police in Dallas later arrested Linnie and transferred him to the Potter County Sheriff's Department after four days. Potter County officials released Linnie three days later when a review of a file photograph of the true subject revealed the mistake. *Id.* at 141. Linnie challenged his three-day detention in Potter County under the Fourteenth Amendment and § 1983. *Id.* at 143–44. The Supreme Court ruled:

> We may even assume, *arguendo*, that, depending on what procedures the State affords defendants following arrest and prior

> to actual trial, mere detention pursuant to a
> valid warrant but in the face of repeated
> protests of innocence will after the lapse of a
> certain amount of time deprive the accused of
> "liberty . . . without due process of law." But
> we are quite certain that a detention of three
> days over a New Year's weekend does not
> and could not amount to such a deprivation.

*Id.* at 145. In *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001), which relied on *Baker*, we confirmed that such a violation could occur and explained that a plaintiff's burden is to show that "it was or should have been known that [he] was entitled to release." *Lee*, 250 F.3d at 683 (quoting *Cannon v. Macon Cnty.*, 1 F.3d 1558, 1563 (11th Cir. 1993)).

3

Cases holding that an incarceration violated the Due Process Clause because defendants should have known the plaintiff was entitled to release fit at least one of two categories: (1) the circumstances indicated to the defendants that further investigation was warranted, or (2) the defendants denied the plaintiff access to the courts for an extended period of time.

But the "further investigation" cases have involved significant differences between the arrestee and the true suspect. In *Fairley*, for example, the plaintiff and the true subject of the warrant not only had different first names but also differed in weight by 66 pounds. 281 F.3d at 915. In *Cannon v. Macon County*, 1 F.3d 1558, 1563 (11th Cir. 1993), the arrestee's "driver's license differed significantly from the description provided for" the suspect and that the

arrestee's "physical makeup did not match the physical description for" the suspect.

And the "denied access" cases have involved significant periods of deprivation. For instance, in *Fairley*, the plaintiff was held for twelve days without a hearing or court appearance. There, we held that the procedures employed violated the Due Process Clause. *Fairley*, 281 F.3d at 915, 918. In *Oviatt v. Pearce*, 954 F.2d 1470, 1473 (9th Cir. 1992), the "plaintiff spent 114 days in jail without an arraignment, a bail hearing, or a trial." Again, we ruled that the procedures that permitted such a delay denied the plaintiff liberty without due process of law. *Id.* at 1477.

4

Rivera has not presented any evidence that the Counties knew that Rivera was not the true subject of the warrant. Nor do the circumstances of this case suggest that further investigation into Rivera's identity was required. Indeed, it appears that the San Bernadino deputies reasonably believed that Rivera was the true subject of the warrant from the time they arrested him. The same considerations that made the arrest reasonable bear on whether the circumstances of the detention should have warned the Counties that Rivera might not be the true subject of the warrant. In this case, the warrant information gave no reason to suspect that Rivera was not the true subject of the warrant since the name and date of birth matched exactly while the physical descriptions were quite similar.[2]

---

[2] That Rivera's address on his driver's license in 2009 did not match the address on the 1989 warrant would not give a reasonable officer pause in

Nor did Rivera's two brief claims of mistaken identity upon arrival at the Los Angeles facility indicate that the Los Angeles defendants should have investigated more thoroughly.[3]  Claims of innocence are common in jails; a jailor need not independently investigate all uncorroborated claims of innocence if the suspect will soon have the opportunity to assert his claims in front of a judge.[4] Unsupported claims of mistaken identity, by themselves, do not trigger a duty to investigate further.

Even assuming Rivera's two casual mentions of mistaken identity suffice to make his incarceration "in the face of

---

identifying Rivera as the subject of the warrant.  It is certainly common for a person to have a different address than he did twenty years ago.

[3] After his initial court appearance, Rivera failed to complain to members of the Los Angeles County Sheriff's Department that he was not the true subject of the warrant.  That Rivera asserted to his public defender (and possibly the prosecutor) that he was not the subject of the warrant is irrelevant.  Public defenders do not act under color of state law for the purpose of § 1983 "when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981).

[4] The dissent would hold that a detainee's uncorroborated claim of mistaken identity creates a constitutional obligation for the jailor to "check readily available, exculpatory information." Dissent at 23–24.  Of course, a great deal of information is "readily available," and a jailor has no way of knowing which evidence, if any, will be exculpatory before starting the investigation.  Such a requirement could be quite burdensome in the aggregate.  Because there is no principled distinction between claims of mistaken identity and other claims of innocence, *cf. Baker*, 443 U.S. at 145–46 (equating claims of mistaken identity with other claims of innocence); *but see* Dissent at 23 n.2, such reasoning would presumably force jailors to investigate non–mistaken identity claims of innocence, which would increase the costs of the rule even more.  *Contra* Dissent at 23 (claiming "no great burden" would be imposed).

repeated protests of innocence," the Due Process Clause was not violated unless Rivera was held for a long enough period of time without adequate procedures. *Baker*, 443 U.S. at 145 (assuming a violation could occur "after the lapse of a certain amount of time" and "depending on what procedures the State affords defendants following arrest and prior to actual trial"). Rivera was taken before a judge the very next day, a significant procedural protection. It is unclear why Rivera did not assert his claim of mistaken identity at the March 10 court hearing, but the failure to take advantage of a procedural protection does not disprove its availability.

Thereafter, he was no longer held simply on the warrant; he was "held in custody pursuant to a court order." If a suspect is held according to court order, county officials are not required to investigate whether that court order is proper. *See Hernandez v. Sheahan*, 455 F.3d 772, 776 (7th Cir. 2006) (upholding a policy that "[i]gnore[s] all claims of misidentification" after a judge commits a suspect to the sheriff's custody); *Lumbermens Mut. Cas. Co. v. Rhodes*, 403 F.2d 2, 7 (10th Cir. 1968) ("Certainly a jailer should not be expected to go behind a court order of commitment to determine whether a person presented for safekeeping has been convicted as a result of some denial of his constitutional rights.").[5] This fact removes this case from the realm

---

[5] The dissent argues that our decision in *Lee* compels the conclusion that "a detainee may still have a due process claim against his jailer despite a prompt court hearing that results in his remand to custody." Dissent at 22. *Lee* permitted a suit based on the pre-hearing detention; it did not purport to impose liability for the post-hearing detention. In the section on which the dissent relies, *Lee* merely explained why the one-day detention at issue in that case could violate the Due Process Clause when the three-day detention at issue in *Baker* did not. *See Lee*, 250 F.3d at 684–85 (distinguishing *Baker*, for due process purposes, because it involved

envisioned by *Baker*.  *See Baker*, 443 U.S. at 145 (discussing "detention pursuant to a valid warrant").  It also distinguishes this case from those involving prolonged incarceration without access to judicial process.  *See Fairley*, 281 F.3d at 915; *Oviatt*, 954 F.2d at 1473.

For the foregoing reasons, Rivera's detention did not violate the Due Process Clause of the Fourteenth Amendment.**[6]**  The district court, therefore, was correct to grant summary judgment for the defendants on this claim.

### III

Rivera has asserted claims under California law as well.  First, he claims that the defendants committed the common law tort of false imprisonment.  Second, he asserts that the defendants are liable under California Civil Code § 52.1(b), the Bane Act, which is a cause of action for violations of constitutional and statutory rights.  Under California law, the Counties, as public entities, are liable for the actions of their employees.  Cal. Gov. Code § 815.2(a).  To the extent their

---

incarceration on "a facially valid warrant" rather than detention of a mentally incapacitated person in the absence of probable cause).  Based on a misreading of *Lee* and concerns about "unsound policy," Dissent at 22, the dissent urges us to create a circuit split.  This we decline to do.

**[6]** In reaching a contrary conclusion, the dissent relies on *Russo v. City of Bridgeport*.  Dissent at 24 (citing 479 F.3d 196 (2d Cir. 2007)).  That case, however, ruled that the detention at issue violated the Fourth Amendment, not the Due Process Clause.  *See Russo*, 479 F.3d at 208 ("[W]e now conclude . . . that the right should instead by analyzed under the Fourth Amendment.").  The dissent, however, agrees that the district court was correct to grant summary judgment on Rivera's Fourth Amendment Claims.  Dissent at 19 ("I agree with the majority that Rivera's Fourth Amendment claims . . . must fail . . . .").

employees would be immune from liability, however, the Counties are also immune.  Cal. Gov. Code § 815.2(b).

California law provides two types of immunity relevant to this case.  First, an officer is not liable for "an arrest pursuant to a warrant of arrest regular upon its face if the peace officer in making the arrest acts without malice and in the reasonable belief that the person arrested is the one referred to in the warrant."  Cal. Civil Code § 43.55(a).  Second, an officer is not liable "for false arrest or false imprisonment arising out of any arrest" that "was lawful, or [that] the peace officer, at the time of the arrest, had reasonable cause to believe . . . was lawful."  Cal. Penal Code § 847(b)(1).

In *Lopez v. City of Oxnard*, 207 Cal. App. 3d. 1, 4 (Ct. App. 1989), plaintiff Lopez had been arrested multiple times on a warrant for which he was not the true subject because his name, date of birth, address, and physical description matched those on the warrant.  After his first arrest, however, the plaintiff obtained a "disposition sheet" from the court, which explained that the plaintiff was not the true subject of the warrant.  Despite bringing this disposition sheet to the officers' attention, the plaintiff was detained twice more, once for three days and once for three hours.  *Id.* at 4–5.  The court held that the arresting officer was immune from liability because "there is no factual question whether the officer had a reasonable belief that Lopez was the person named in the warrant."  *Id.* at 9.  The court also held that the sheriff's department that jailed the plaintiff was not liable, despite failing to consider the disposition sheet, because jail personnel "are entitled to rely on process and orders apparently valid on their face."  *Id.*

Because the employees relevant to this case would be able to invoke statutory immunities to avoid liability, the Counties can as well. Therefore, the district court's grant of summary judgment based on statutory immunities was correct.

IV

For the foregoing reasons, the district court properly granted the defendants' motions for summary judgment.

**AFFIRMED.**

PAEZ, Circuit Judge, concurring in part and dissenting in part:

Although I agree with the majority that Rivera's Fourth Amendment claims against Los Angeles County and San Bernardino County, his Fourteenth Amendment claims against San Bernardino County, and his state law claims against both counties must fail, I disagree with the majority's analysis of the due process claim in this case. In my view, Rivera has raised a genuine issue of material fact as to whether Los Angeles County deprived him of liberty without due process of law. Accordingly, I respectfully dissent from Part II.C of the majority's opinion.

I.

As the majority acknowledges, after the lapse of a certain period of time, "a detainee has 'a constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release.'" *Lee v. City*

*of Los Angeles*, 250 F.3d 668, 683 (9th Cir. 2001) (quoting *Cannon v. Macon Cnty.*, 1 F.3d 1558, 1563 (11th Cir. 1993)). The majority contends, however, that there are just two types of scenarios where a jailer should know that a detainee is entitled to release: (1) circumstances indicate that further investigation is warranted, or (2) the detainee is denied access to the courts for an extended period of time. Maj. Op. at 13. The existence of "significant differences between the arrestee and the true suspect" may warrant additional investigation, but "[u]nsupported claims of mistaken identity . . . do not trigger a duty to investigate." *Id.* at 13, 15. Finally, the majority holds that after the detainee appears in court, county officials can never have an obligation to further investigate. *Id.* at 16–17. Under this view, unless a detainee has the good fortune to (1) exhibit obvious physical or biographical differences from the true subject of the warrant, or (2) possess support for his claim of mistaken identity, county officials are free to ignore his complaints. Furthermore, even the limited duty to investigate obvious indicia of mistaken identity is extinguished once the detainee appears in court. Neither case law nor logic compel such a cabined understanding of the due process rights of detainees.

Our precedent does not delineate what circumstances must exist before an officer or agency should know that a detainee is entitled to release. It simply mandates that if an officer or jailer should have known that the detainee was entitled to release, "a detainee has 'a constitutional right to be free from continued detention . . . .'" *Lee*, 250 F.3d at 683 (quoting *Cannon*, 1 F.3d at 1563). The majority treats our existing case law as the outer boundaries of when county officials should have known that a detainee was entitled to release. But we have had only three occasions to consider such claims. *See Fairley v. Luman*, 281 F.3d 913, 915,

917–18 (9th Cir. 2002) (per curiam); *Lee*, 250 F.3d at 677–78, 683–84; *Oviatt v. Pearce*, 954 F.2d 1470, 1473–77 (9th Cir. 1992).  In none of those cases did we suggest that physical differences between a detainee and the true subject of the warrant or lengthy detention without a court hearing were *requirements* to a successful due process claim.  The examples cited by the majority are just that; they do not provide a basis for concluding that no other set of facts could sustain a detainee's due process claim.  Moreover, the majority creates a bright-line rule that jailers owe nothing to detainees whose claims of mistaken identity are "[u]nsupported."  Maj. Op. at 15.  We have never suggested that a jailer's duty to investigate is contingent on a detainee first presenting his jailer with supporting evidence.  Nor can I see any logical basis for limiting a detainee's due process rights to these circumstances.  The touchstone is simply whether the jailer should have known, despite the existence of probable cause at the time of arrest, that a detainee was entitled to be released.  This is inherently a fact-intensive, circumstance-specific inquiry.

The majority's next conclusion—any duty the jailers have to investigate terminates once a detainee is held pursuant to a court order—is even less sound.  *See* Maj. Op. at 16–17. The majority relies on several out-of-circuit cases to support its conclusion, *see id.* (citing *Hernandez v. Sheahan*, 455 F.3d 772, 776 (7th Cir. 2006) and *Lumbermens Mut. Cas. Co. v. Rhodes*, 403 F.2d 2, 7 (10th Cir. 1968)), but such a conclusion cannot be squared with our precedent.  In *Lee*, the detainee, Kerry Sanders, who was mistakenly identified as the subject of a warrant from the State of New York, had an extradition hearing within one day of his arrest.  250 F.3d at 678, 684.  At the hearing, after some dispute about the validity of Sanders's Waiver of Extradition form, the court

accepted the waiver.  *Id.* at 678 n.3.  Subsequent to the hearing, Sanders, just like Rivera, was held pursuant to a court order until New York state officials took custody of him.  *See id.*; Cal. Penal Code § 1555.1 (If a waiver of extradition is executed, the "magistrate shall remand the person to custody without bail, unless otherwise stipulated by the district attorney with the concurrence of the other state."). Nonetheless, in *Lee*, we specifically held that "[t]he argument that Kerry Sanders's due process claim must fail at the pleading stage because he was incarcerated for only one day before his extradition hearing is . . . unavailing."  250 F.3d at 684.  Under *Lee*, then, a detainee may still have a due process claim against his jailer despite a prompt court hearing that results in his remand to custody; the court order does not necessarily obviate a county's obligation to investigate the validity of continued incarceration.  *Id.*[1]  The majority's conclusion to the contrary is inconsistent with *Lee*.

Furthermore, exonerating a jailer of any obligation to investigate once a court remands a detainee to custody is an unsound policy.  As this case demonstrates, if the detainee's only recourse is to seek court intervention to verify his identity, he may languish in detention for weeks while the court searches its records for dated physical files.  In contrast, county jail officials typically have instantaneous access to extensive criminal history records and fingerprint databases.

---

[1] The majority reads *Lee* as permitting liability for only the pre-hearing detention.  Maj. Op. at 16 n.5.  *Lee* specifically contemplates that the defendants might be liable for "Sanders's two-year incarceration," not the one-day pre-hearing detention.  *Lee*, 250 F.3d at 685.  Indeed, *Lee* holds that certain New York state officials may be held accountable for Sanders's detention, and those officials only became involved in Sanders's case after the extradition hearing.  *Id.* at 678, 695.

It is no great burden to expect them to access these readily available resources when appropriate.[2,3]

## II.

The majority has imposed a variety of unjustified restrictions on Rivera's Fourteenth Amendment claim. In determining whether a violation occurred, the only inquiry is simply whether it "'was or should have been known that the detainee was entitled to release.'" *Lee*, 250 F.3d at 683 (quoting *Cannon*, 1 F.3d at 1563). I would hold that here, Rivera's complaints of mistaken identity, in conjunction with Los Angeles County's failure to conduct any investigation or check readily available, exculpatory information, were sufficient to create a genuine, triable issue of fact as to whether the County should have known that he was entitled

---

[2] This does not mean that jailers have a constitutional duty to scour readily available databases for exculpatory information any time a detainee claims that he is innocent, and I do not contend otherwise. *Contra* Maj. Op. at 15 n.4. Here, it is the failure to conduct *any* investigation in response to Rivera's complaints of mistaken identity that creates a genuine issue of fact as to whether Los Angeles County should have known that Rivera was entitled to be released. *See* Dissent at 23. If a constitutional obligation can be inferred from the holding I would adopt, it is that jailers must implement investigatory procedures to handle complaints of mistaken identity.

[3] Los Angeles County contends that once a detainee is held pursuant to a court order, jailers lack the discretion to release him. Even so, this would not prevent jailers from investigating and informing the detainee, the prosecutor, defense counsel, and the court, of any determination that the detainee is not the true subject of the warrant.

to be released.[4]  *See Baker v. McCollan*, 443 U.S. 137, 148 (1979) (Blackmun, J., concurring) ("[D]eliberately and repeatedly refus[ing] to check the identity of a complaining prisoner against readily available mug shots and fingerprints" "might prove a due process violation."); *Russo v. City of Bridgeport*, 479 F.3d 196, 201, 208 (2d Cir. 2007) (holding that a detainee is protected from "a sustained detention stemming directly from the law enforcement officials' refusal to investigate available exculpatory evidence" and allowing an action under 42 U.S.C. § 1983 against the jailers to proceed even though the detainee had numerous court appearances during his detention).[5]

Rivera testified that, upon arriving at the Los Angeles County jail, he complained to two Los Angeles County officials that he was not the individual wanted in the warrant.

---

[4] I do not address whether San Bernardino County officials should have known that Rivera was entitled to be released. Even assuming that San Bernardino County officers should have known that Rivera was entitled to be released, Rivera has offered no evidence of a municipal policy or custom that was deliberately indifferent to complaints of misidentification. Rivera only argues that San Bernardino County does not require "positive identification accomplished through the exchange of fingerprint facsimiles." But the failure to access fingerprint databases for every individual arrested or detained does not evince deliberate indifference to any constitutional right.

[5] The majority's attempt to distinguish *Russo* on the ground that it is a Fourth Amendment case is unpersuasive. *See* Maj. Op. at 17 n.6. The claim in *Russo* is the same claim we are faced with here. In the Second Circuit's view, recent Supreme Court case law has suggested that the source of the right first recognized in *Baker* is the Fourth Amendment rather than the Fourteenth Amendment; consequently, it analyzes Russo's claim under the Fourth Amendment. *Russo*, 479 F.3d at 208. The Fourth Amendment claim discussed in the relevant portion of *Russo* is not, as the majority wrongly insinuates, an unlawful arrest claim. *See id.* at 205, 208.

First, he informed a male official behind a window that he was "being mistaken for another person." The male official wrote something down and directed Rivera to "[g]o to the cell." He took no further action. Rivera also informed another official, a young woman behind a window, that "they were confusing me with a person who had run over two people here in Culver City." The woman responded by saying "I'm sorry," but also took no further action. In my view, a factfinder could reasonably conclude that such complaints were sufficient to put an officer or county official on notice that further investigation was necessary.[6]

Had either officer followed up with Rivera or conducted an independent investigation, the officer would have discovered—with relative ease—that Rivera was not the true subject of the warrant. A Los Angeles County official could have searched the California Law Enforcement Telecommunications System ("CLETS"), a statewide criminal records database maintained by the California Department of Justice. CLETS would have returned two hits with distinct criminal information and identification ("CII") numbers. Although the record contains some evidence that, occasionally, the same individual may be associated with two CII numbers, as a general matter, CII numbers are unique identifiers; two distinct CII numbers, then, would have alerted the officer to the fact that there was likely at least one other person who shared the warrant subject's name and birthdate. The officer could have then run the two CII numbers through CLETS, and received two distinct criminal history reports.

---

[6] The majority dismisses these complaints as "brief" and "casual," *see* Maj. Op. at 15–16, but it is the factfinder's role to assess whether Rivera's pleas that he was being mistaken for another individual should have prompted some action.

One report would have included a 1985 arrest for involuntary manslaughter, and the other would not have. Even more critically, the reports would have indicated that one of the individuals had previously been exonerated of the very charges for which Rivera was detained. The official would have then had good reason to believe that the CII numbers belonged to two different individuals. The official could have confirmed this by running the two CII numbers through the Automated Fingerprint Identification System ("AFIS"), which would have returned two distinct sets of fingerprints. By comparing Rivera's fingerprints to the fingerprints associated with both CII numbers, the officer then could have determined that Rivera was the individual who had previously been exonerated of the charges, and not the true subject of the warrant. When the failure to take these simple steps results in a month-long detention of a man who twice alerted officials that he had been mistaken for another individual, a factfinder could reasonably conclude that a due process violation occurred.

### III.

Even if a factfinder were to conclude that Los Angeles County officials violated Rivera's due process rights, the inquiry would not end there. A municipality is liable for constitutional violations only where its policies or customs "evince a 'deliberate indifference' to the constitutional right and are the 'moving force behind the constitutional violation.'" *Edgerly v. City and Cnty. of San Francisco*, 599 F.3d 946, 960 (9th Cir. 2010) (quoting *Levine v. City of Alameda*, 525 F.3d 903, 907 (9th Cir. 2008)).

Rivera contends that Los Angeles County has a policy of relying on the arresting agency's identification. Los Angeles

County does not dispute that, as a general matter, it does not verify the identity of individuals arrested by a different agency; however, if an individual arrested by a different agency complains that he is not the subject of the warrant, Los Angeles County will conduct an investigation.  Rivera has not shown how the failure to conduct an investigation at the outset for every person arrested by another agency is deliberately indifferent to a detainee's constitutional rights.

On the evidence presented, however, a factfinder may nonetheless conclude that Los Angeles County's policy is deliberately indifferent to a detainee's due process rights and was the moving force behind the violation.  Sergeant Angela Becerra, the Document Control Sergeant at the Inmate Reception Center of the Los Angeles County jail, described the County's policy as follows:  When a detainee complains that "he is not the subject of a warrant on which he has been arrested or detained," officials fill out a Disputed Warrant Verification Form and begin an investigation.  They compare the detainee's and the warrant subject's physical characteristics, dates of birth, CII numbers, and, if necessary, criminal histories.  However, Agent Becerra's declaration also states that this is a rare complaint, noting that many inmates will complain "that they are 'innocent', that they were arrested by 'mistake,' or that they are not the person the police are looking for," but not that they had been "misidentified with a warrant."

A factfinder could reasonably conclude from the above that Los Angeles County has a policy of investigating only those complaints of misidentification that have been phrased in very precise, particular terms.  Applying the Disputed Warrant Verification Form procedures only when a detainee specifically complains that he is not the subject of the warrant

and ignoring the other, more common complaints may well be deliberately indifferent to a detainee's constitutional rights. After all, a lay person has no means of knowing that, to get an officer's or county official's attention, he must state, in very specific terms, that he is not the true subject of the warrant; instead, he may reasonably attempt to explain his predicament by indicating that the police have mistaken him for another person or that he is not the person the police are seeking. It is entirely obvious that refusing to investigate any but the most precise misidentification complaints will lead to the unconstitutional detention of innocent individuals. *See Lee*, 250 F.3d at 682 ("[D]eliberate indifference to a person's constitutional rights occurs when the need for more or different action, 'is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.'" (second alteration in original) (quoting *Oviatt*, 954 F.2d at 1477–78)).

If the factfinder were to conclude that Los Angeles County has a policy of investigating only a narrow set of very precisely-worded complaints, the factfinder could also reasonably conclude that this policy was the moving force behind the deprivation of Rivera's rights. In order to be the "moving force" behind a plaintiff's injury, the "'identified deficiency' in the County's policies [must be] 'closely related to the ultimate injury.'" *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1196 (9th Cir. 2002) (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)). Here, the statements Rivera made to the Los Angeles County officials are remarkably similar to Agent Becerra's examples of complaints that would be considered distinct from general misidentification claims. A factfinder could reasonably

determine that Rivera's complaints were therefore ignored because of a municipal policy to not investigate such complaints.

## IV.

For the above reasons, I would hold that a genuine issue of material fact exists as to whether Rivera's due process rights were violated and whether Los Angeles County may be held liable for the violation. I would therefore affirm in part and reverse in part the district court's order granting summary judgment in favor of Defendants.